# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KELVIN NORWOOD,             )
                                )
        Plaintiff,          )
                                )     No. 11 CV 988
        v.                 )
                                )     Hon. Charles R. Norgle
DR. IMHOTEP CARTER,     )
DR. PARTHSARATHI GHOSH, DR. LIPING  )
ZHANG, DR. ANDREW TILDEN,    )
LATANYA WILLIAMS, and      )
MARCUS HARDY,          )
                                )
        Defendants.     )

## OPINION AND ORDER

Plaintiff Kelvin Norwood ("Norwood"), an Illinois state prisoner, sues Defendants Dr. Parthsarathi Ghosh ("Dr. Ghosh"), Dr. Liping Zhang ("Dr. Zhang"), Dr. Andrew Tilden ("Dr. Tilden"), and physician assistant LaTanya Williams ("P.A. Williams") in their individual capacities for denial of adequate medical in violation of his Eighth Amendment rights under 42 U.S.C. § 1983 and intentional infliction of emotional distress under Illinois state law. Norwood sues Defendants Dr. Imhotep Carter and Marcus Hardy in their official capacities for injunctive relief.[1] Before the Court are Defendants' motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, Defendants' motions are granted.

## I. BACKGROUND[2]

Norwood, at all times relevant to this action, was an inmate at the Stateville Correctional Center ("Stateville"). Norwood suffers from chronic problems with both his knees, beginning

---

[1] Medical Director Dr. Imhotep Carter and Warden Marcus Hardy are public officers who left office while this action is pending. Pursuant to Fed. R. Civ. P. 25(d), their successors at Stateville, Dr. Saleh Obaisi and Tarry Williams, respectively, are substituted.

[2] The Court takes the facts from Plaintiff's Local Rule 56.1 statements and notes disputed facts, if any, within the text.

more than a decade ago. He first had surgery on his right knee in 1998 or 1999, before he was incarcerated. To the best of Norwood's recollection, the surgery was some form of ligament repair to his right knee. When Norwood began serving his sentence at Stateville in 2004, his knees were not bothering him and he was even able to play basketball. However, Norwood hurt his knees on two occasions while jumping down from the top bunk-bed of his cell, once in May of 2006 and again July of 2009. These acute injuries precipitated further medical treatment and Norwood ultimately received a full right knee replacement under the care and custody of the Illinois Department of Corrections. Norwood still experiences swelling, instability, and severe pain in his right knee.

The defendants in this case were all, at one point or another, employed at Stateville. Dr. Tilden treated Norwood twice after his May 12, 2006 injury. P.A. Williams routinely treated Norwood after his May 12, 2006 injury and twice after his July 9, 2009 injury. Dr. Ghosh was the medical director at Stateville until March 31, 2011. During his tenure, he reviewed Norwood's medical records and often recommended certain courses of treatment; he also personally treated Norwood after his July 9, 2009 injury. Dr. Zhang treated Norwood twice, but only once related to a knee injury. On June 22, 2010, Dr. Zhang changed Norwood's pain prescription from Tramadol to Motrin. These four medical professionals are referred to collectively as the "Medical Provider Defendants" herein. Norwood also sues the Medical Director of Stateville, now Dr. Saleh Obaisi, and the Warden of Stateville, now Tarry Williams, in their official capacities.

On May 12, 2006, Norwood hurt himself getting out of the top bunk-bed. Norwood does not explain why, but he did not visit the Health Care Unit ("HCU") for treatment for three days. On May 15, 2006, Norwood was seen by Certified Medical Technician ("CMT") Robert

Katoniel. After reviewing the medical records, Dr. Ghosh and P.A. Williams said that Norwood's left knee was treated. Norwood states that it was his right knee that was injured. CMT Katoniel's assessment was that Norwood had "Left knee edema, tender to touch, no redness, decreased range of motion, with sharp pain," and the diagnosis was a sprained knee. Williams Dep. 31; Ghosh Dep. 58-59. Norwood received an "Ace wrap" (a cloth bandage) on his knee and was told to return to the clinic as needed.

Norwood returned to the HCU on May 31, 2006, and Dr. Tilden treated Norwood for a "left knee strain/contusion." Tilden Decl. ¶ 3. In his assessment of Norwood, Tilden wrote "Left knee with mild edema, decreased range of motion, moderate tenderness" and "Contusion, left knee, and rule out degenerative joint disease." Ghosh Dep. 67-68. Dr. Tilden "prescribed Motrin and a knee wrap based on his complaints." Tilden Decl. ¶ 5. However, Norwood's medical progress notes indicate that an X-ray of his left knee was also scheduled. Pl.'s Ex. H at Plaintiff 22.

Norwood next visited the HCU for follow-up on June 14, 2006, and was again treated by Dr. Tilden. The medical record from that date included a notation stating, "left knee, no edema, no erythema. Full range of motion." Ghosh Dep. 88. Dr. Tilden did not recommend a follow-up visit or renew Norwood's prescription. That was the last time that Dr. Tilden treated Norwood and Dr. Tilden has not been employed at Stateville since January 1, 2007.

Norwood's initial Motrin prescription was only valid for two months, and did not automatically renew; an M.D. or P.A. was required to evaluate Norwood before his prescription could be renewed. Norwood sought another prescription for Motrin on October 23, 2006. Norwood saw CMT Wendy Olson on October 23, 2006, but she did not have the authority to write a prescription. Norwood was referred for follow-up on November 1, 2006.

On November 1, 2006, P.A. Williams examined Norwood and concluded that he had "Left knee crepitus, decreased range of motion, secondary to pain." Williams Dep. 42. P.A. Williams examined Norwood's knee for abnormalities that she could feel or hear. P.A. Williams again ordered an X-ray of his left knee because Norwood still had not received the X-ray ordered on May 31, 2006. She also recommended that Norwood receive an elastic knee support. An inmate usually receives an X-ray within two weeks of an order being placed. An MRI was not ordered during this visit. Dr. Ghosh approved Williams' recommendation on November 17, 2006, permitting Norwood to keep the elastic knee support through December 31, 2007. Before the end of 2006, Norwood received a physical examination, an X-ray, pain medication, and an elastic knee brace. According to Norwood, the pain medication and knee brace did not alleviate Norwood's pain.

Between November 1, 2006 and September 26, 2007, Norwood saw medical professionals at the prison for other ailments, but he did not complain about knee pain. The medical records differ from Norwood's testimony. Norwood states that his knee pain did not improve from May 2006 to the end of 2008 and that he would complain about his knee pain whenever he saw a member of the prison's medical staff. When questioned further, he retracted from his previous assertion that his knee pain never improved and said that medical staff would "only let you talk about like two problems that you are having. So you are not able to tell them everything." Norwood Dep. 36.

According to the medical records before the Court, the next time that Norwood was seen for knee pain was on September 26, 2007, by P.A. Williams. She documented that Norwood "complained of pain in both knees. Felt a popping when he was walking a few days ago. Left knee swells and is painful. Knee supports were taken by orange crush during a shakedown a few

4

months ago. It was helping. Had arthroscopy, 1999 at Springfield Hospital, a work-related injury." Williams Dep. 44-45. "Orange crush" is a tactical team that searches the inmates' cells for paraphernalia that the prison does not permit the inmates to possess. P.A. Williams examined Norwood and describes the process:

> When I examined the right knee I touched – I put my hands over his knee. At that point the knee is extended and then flexed. Within that movement you can feel certain things that occur under there. So crepitus is something that I – I felt when I was moving his knee. I visualized that there was some slight swelling. I touched his knee again and noted that it was tender to palpation. Palpation simply means touch. And then the pain or tenderness seemed to be greatest over the knee. Decreased range of motion meant range of motion, basically movement. Decreased strength means that – as in strength in an extremity, it was decreased probably because of the pain that he was experiencing at that time.

Williams Dep. 48. P.A. Williams further explains that "Crepitus is part of a condition called osteoarthritis or degenerative joint disease, which is a natural progression with the body deteriorating over time. So it wouldn't be surprising for [her] to find crepitus on somebody that's not even complaining of knee pain." Williams Dep. 49; see also Ghosh Dep. 136. Crepitus, also known as chronic arthritis, is a condition that can likely be seen on an X-ray. She ultimately referred Norwood for a medical director evaluation and reordered elastic knee supports, this time for both knees. An X-ray was not ordered for Norwood during this visit because an M.D. has to examine the patient before an X-ray is ordered.

Dr. Ghosh describes crepitus as "not that serious. Crepitus [is] just an incidental finding," however, Dr. Ghosh does note that "crepitus [is] most commonly seen in fractures. That's the most common reason you feel fractures." Ghosh Dep. 149. In Norwood's case, Dr. Ghosh explains that, "[h]ere we are not talking about fractures. If somebody is not mentioning that[] he has fracture of the bone." Ghosh Dep. 149. Ideally,

once a medical doctor finds that a patient has crepitus, Ghosh "will get an X-ray first and then evaluate the patient" to determine "if there is any meniscal tear." Ghosh Dep. 150. Dr. Ghosh is unaware if Norwood received an X-ray on September 26, 2007, but he does recall that he "saw an X-ray of the left knee which was injured...but [he] didn't see [an X-ray] on the right knee." Ghosh Dep. 151. Dr. Ghosh admits that by October 22, 2007, Norwood "should be seen by an MD and when he sees an MD, he has to bring this issue up for his knees." Ghosh Dep. 151.

Norwood had not seen an M.D. and had not received his knee supports when he informally followed up with P.A. Williams on October 22, 2007. A medical technician, not P.A. Williams, is responsible for scheduling a patient for examination with the medical director. However, P.A. Williams was responsible for filling out the September 26, 2007 prescription order for Norwood's knee braces, and the prescription order on the 26th did not include a request for any knee braces. P.A. Williams blamed her forgetfulness on the medical technician, who actually enters and fills the prescription, for not reminding her to complete the knee brace order. P.A. Williams also says that it is the responsibility of the patient to bring all of his or her problems to the attention of the treating medical professional at the time of the appointment, for example, if Norwood did not mention that he had not seen the medical director, she would not inquire further. However, whether or not Norwood actually saw the medical director would have been apparent from reading his progress notes.

Norwood's informal visit with P.A. Williams on October 22, 2007, did not resolve the dilemma of his missing knee braces. He inquired informally again with P.A. Williams on December 12, 2007, because he still had not received his knee braces.

In a formal visit with P.A. Williams on December 19, 2007, Norwood still had had not received his knee braces. At this point, there was still no indication in Norwood's progress notes that he had seen the medical director. P.A. Williams did not think much of it and did not inquire further because "He did not mention it, and they normally will always let you know when they don't receive either an item that was ordered or when they haven't gotten a particular referral." Williams Dep. 68. A new X-ray for Norwood's knees was not ordered. Dr. Ghosh admits that he would have done things a little differently if he was in P.A. Williams' position, he would "get X-rays or whatever." Ghosh Dep. 170. However, Dr. Ghosh had "no explanation" why Norwood had not seen a medical doctor between September 26, 2007 and December 19, 2007. Ghosh Dep. 172.

It is unknown when exactly Norwood received his elastic knee braces, but he did not formally complain about either of his knees again until October 16, 2008, when he visited the health care unit for sinus medication and mentioned that he still had not been seen by the medical director for an examination of his left knee. At that appointment, he was again referred for an evaluation with the medical director, an evaluation requiring further studies, which could have included "X-rays, then other tests, MRI and other stuff." Ghosh Dep. 181. There is no record that Norwood was ever seen by the medical director pursuant to that referral. Norwood says that he had pain in both knees throughout 2007 and 2008. He also continued to receive and take pain medication throughout 2007 and 2008.

Norwood hurt himself a second time getting out of the top bunk in his cell on July 9, 2009, and he was treated the very same day, again by P.A. Williams. During that visit, Norwood "complained of pain, right knee, with swelling. Felt a pop when [he] got out of

bed, or got out of bunk this morning." Williams Dep. 75. This time Norwood's condition

was much different; P.A. Williams explains:

> September 26 of '07. It appeared that the patient was ambulating fine. It didn't be – appear to be anything emergent or super urgent. Whereas the visit on July 9th of 2009, I noted that the patient was walking with a limp and that he appeared obviously to be having trouble putting weight or pressure on that – on that knee.

Williams Dep. 80. Williams wanted to rule out that Norwood did not tear his anterior cruciate

ligament ("ACL") or Medial Collateral ligament ("MCL") and scheduled Norwood for an

evaluation with Dr. Ghosh on July 16, 2009. P.A. Williams also told Norwood to ice his knee for

24 hours, then apply heat, then elevate his leg; issued him a 3-month permit for a low bunk;

prescribed 800 mg Motrin; provided him with crutches; and issued him a 1-week permit for lay-

in. "Lay-in" is when prison officers deliver food directly to the inmate in his cell. The 800 mg of

Motrin prescribed for pain, was twice the regular dose and the maximum that Dr. Ghosh would

prescribe. The injury that Norwood suffered on July 9, 2009, appeared to be acute, not like the

chronic knee pains P.A. Williams had treated in the past.   Dr. Ghosh evaluated Norwood on

July 16, 2009, as scheduled, and ordered that he receive a Magnetic Resonance Imaging ("MRI")

scan. Norwood was transported to the University of Illinois-Chicago hospital ("UIC") and

received an MRI of his right knee on September 11, 2009. Dr. Ghosh reviewed the MRI of

Norwood's left knee on September 16, 2009, and diagnosed Norwood with a lateral meniscal

tear, a cartilage defect, and a Baker's cyst – a type of chronic knee arthritis. On the same day he

reviewed the MRI, Dr. Ghosh recommended Norwood for a consultation with an orthopedic

specialist at UIC. Dr. Ghosh's request to send Norwood for an off-site consultation was approved

by Wexford headquarters on November 20, 2009.

Three days later, on November 23, 2009, Norwood met Dr. Chmell, the orthopedic specialist who ultimately performed Norwood's knee surgery. At the initial visit, Dr. Chmell recommended Norwood for "Right knee arthroscopy for loose body removal and chondroplasty." Chmell Dep. 19. Arthroscopy is a surgery that involves a small incision near the knee that allows doctors to insert a pen-sized camera and look at the inner area of the knee. A chondroplasty is the process of smoothing out a rough portion of cartilage in somone's knee. Arthroscopy and chondroplasty are commonly performed during the same operation. Upon Dr. Chmell's recommendation, Dr. Ghosh requested that the surgery be scheduled. Norwood's surgery was originally scheduled for January 5, 2010, but due to unexplained delays, the surgery did not occur until April 27, 2010. Norwood's prescription for pain medicine continued to be renewed while he awaited his surgery, up until a few days before he underwent surgery. Dr. Chmell performed Norwood's knee surgery on April 27, 2010. For post-surgery pain management, Dr. Chmell prescribed Vicodin, one pill taken every 4-6 hours, or as needed.

Norwood returned to the Stateville infirmary on the same day as the surgery, where he was admitted for 23 hours. Norwood does not remember receiving any medications for his knee immediately after surgery, he recalls that he "had to go back to the hospital and the doctor there prescribed [him] Tramadol for [his] pain." Norwood Dep. 66. According to the medical records, however, Dr. Ghosh prescribed Tylenol 3 instead of Vicodin for Norwood's pain, told him to elevate his leg, and provided him crutches. Dr. Ghosh thought that Tylenol 3 was an adequate substitute for Vicodin. Additionally, the pharmacy at Stateville did not carry an inventory of Vicodin, and an order would take "a day or two to come from [an outside] pharmacy." Ghosh Dep. 312. Dr. Ghosh considered several pain relieving drugs in his decision, ranging from Morphine to Vicodin to Tylenol 3 to Motrin. Morphine is the strongest pain medication but is

rarely used because it can cause more problems for the patient. Tylenol 3 is a similar medication to Vicodin. Motrin is the least potent, but has the least side effects, and can be taken the most frequently. Motrin also does not contain Codeine, like Tylenol 3, so it can be taken by inmates in the cell house; Codeine is a narcotic and can lead to potential abuse.

Norwood was given the option of remaining in the infirmary and to "take Tylenol 3 for a few days" but he did not, "he wanted to go." Ghosh Dep. 320. When Norwood was released from the infirmary to his cell unit, he was issued a low bunk permit until June 30th, had meals delivered to his cell until May 10th, prescribed 400 milligrams of Motrin for seven days, and scheduled for a follow up visit with Dr. Chmell on May 3, 2010.

In the post-operation report, Dr. Chmell found that Norwood "had a medial femoral condyle defect and he had synovitis; and to treat those problems, [Chmell and his surgical team] did the arthroscopy, [they] removed the synovitis – that's called synovectomy – and [they] smoothed out the roughened defect on the medial femoral condyle, and that's called chondroplasty." Chmell Dep. 29. The pre-surgery MRI scan was unduly sensitive and showed what appeared to be abnormalities in Norwood's knee that were not actually present, which is why the post-operation report differs from Dr. Ghosh's initial diagnosis – Norwood did not have a lateral meniscal tear or a Baker's cyst.

Norwood's follow up visit with Dr. Chmell occurred on either May 3rd or 4th of 2010. Dr. Chmell reported that "Mr. Norwood came back doing well. Took out his stitches. Changed his prescription from Vicodin to Tramadol. He's – he can walk without crutches. He had been using crutches. He didn't need the crutches any longer. He did have some mild discomfort. That's about it." Chmell Dep. 35. Norwood's recollection about his use of crutches differs from Dr. Chmell's prognosis; Norwood does not recall ever being crutch free since his April 2010

surgery. Dr. Chmell's conclusion at the follow-up visit, however, was that "it looked like the surgery was successful." Chmell Dep. 36. He prescribed Tramadol for pain, but did not think that Norwood required formal physical therapy.

Dr. Ghosh prescribed Tramadol for Norwood and he also prescribed physical therapy. In June of 2010, Norwood's Tramadol prescription was changed to Motrin. Generally, Tramadol is only prescribed for a short period because it is a synthetic opiate that can be addictive and potentially result in drug abuse. Dr. Zhang wrote the prescription on June 22, 2010, changing Norwood's pain medication from Tramadol to Motrin. Dr. Ghosh saw Norwood personally in a formal visit on July 13, 2010, at which Norwood complained of swelling, instability and decreased range of motion in his right knee. Dr. Ghosh recommended that Norwood continue receiving Motrin and participate in physical therapy.

From then on, the frequency of Norwood's visits to the HCU decreased, however, he continued to see Stateville medical professionals for other ailments, such as allergies, an eye problem, and stomach issues. He received treatment for his knee on an as needed basis after the surgery, he continued to receive Motrin or Ibuprofin, and he continued to participate in physical therapy at least once a week. Norwood received physical therapy until August 29, 2011.

Norwood did not see Dr. Chmell for any problems with his knee for almost two years, when he returned on March 19, 2012. Because the April 27, 2010 surgery did not completely remedy his knee problems, Norwood ultimately underwent a full right knee replacement on September 23, 2014. Norwood has not been pain free in his knees since 2006. Norwood complains that he continues to suffer from inadequate medical care while incarcerated at Stateville. He has filed at least ten administrative grievances about the Stateville HCU since his surgery in April of 2010. On February 8, 2011, Norwood initiated the instant action. At the

conclusion of discovery, Defendants moved for summary judgment. The motions for summary judgment are fully briefed and before the Court.

## II. DISCUSSION

### A. Standard of Decision

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). The Court views the evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. Id. The Court does not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." Stokes v. Bd. of Educ. of the City of Chi., 599 F.3d 617, 619 (7th Cir. 2010). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Summary judgment is appropriate if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Majors v. Gen. Elec. Co., 714 F.3d 527, 532 (7th Cir. 2013) (quoting Celotex Corp., 477 U.S. at 322).

### B. Ghosh, Zhang, Tilden, and Williams's Motion for Summary Judgment

The Medical Provider Defendants argue that they are entitled to summary judgment in their favor on Norwood's § 1983 claim because they were not deliberately indifferent to

Norwood's medical needs. The Eighth Amendment protects inmates in state prisons from the intentional denial, delay, or interference with adequate medical care. Estelle v. Gamble, 429 U.S. 97, 104-5 (1976). Accordingly, to state a claim under 42 U.S.C. § 1983 based on inadequate medical care, a plaintiff "must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011).

"A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or…is so obvious that even a lay person would perceive the need for a doctor's attention.'" Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011) (quoting Greeno v. Daley, 414 F.3d 645, 653 (7th Cir. 2005)). The injury "need not be life-threatening to be serious; rather it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010).

The second element, deliberate indifference, is a subjective standard. Arnett, 658 F.3d at 751. A plaintiff is required to show that the officials "know of and disregard an excessive risk to inmate health; indeed they must 'both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and 'must also draw the inference.'" Greeno, 414 F.3d at 653 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). However, "[d]eliberate indifference is not medical malpractice; the Eight Amendment does not codify common law torts." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008). Deliberate indifference requires a more blameworthy state of mind than negligence; it requires "a sufficiently culpable state of mind, something akin to recklessness." Arnett, 658 F.3d at 751 (internal quotation marks and citations omitted). An official may be liable if a "jury can 'infer deliberate indifference on the

basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." Duckworth, 532 F.3d at 679 (quoting Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006)).

The Medical Provider Defendants do not argue that Norwood does not suffer from an objectively serious medical condition; they only contend that they were not deliberately indifferent to Norwood's medical needs. Norwood asserts that he has provided extensive evidence that the Medical Provider Defendants have unjustifiably delayed or denied him basic medical needs after he sustained his knee injury in 2006. Specifically, Norwood argues that the Medical Provider Defendants failed to adhere to generally accepted standards of care by not conducting a MRI until November 2009, not timely scheduling his follow up care with an orthopedic specialist, and not providing proper pain medication. The Court reviews the conduct of each treating medical professional in turn.

*1. P.A. Williams*

Norwood first saw P.A. Williams on November 1, 2006. She examined his left knee and Norwood subsequently received an X-ray, pain medications, and a knee brace. The results of the X-ray taken in 2006 are not included in the record, so there is no evidence of what the X-ray revealed about the conditions of Norwood's left knee.

When P.A. Williams saw Norwood for problems in both of his knees on September 26, 2007, there was some kind of scheduling, clerical, or ordering error that ensued. As a result, Norwood did not receive a second X-ray, a visitation with a M.D., or his knee braces for several months. It appears that P.A. Williams did not review Norwood's medical progress chart and did not inquire whether Norwood received the follow up treatment that she recommended. However,

these errors do not amount to "something akin to recklessness." Arnett, 658 F.3d at 751. Furthermore, Norwood continued to receive pain medication during this time, and once he received the knee braces, he seemed to stop complaining about any problems with his knees.

After Norwood aggravated his knee problems on July 9, 2009, P.A. Williams' course of treatment and sense of urgency to the matter was much different. P.A. Williams noted that Norwood was having trouble walking, prescribed him several things to ease the pain, and scheduled him for an appointment with Dr. Ghosh a week later. That was the last time P.A. Williams treated Norwood before his April 27, 2010 surgery. The undisputed facts setting out the plethora of treatment provided by P.A. Williams shows, as a matter of law, that she did not treat Norwood with deliberate indifference. Summary judgment is granted in favor of P.A. Williams.

*2. Dr. Ghosh*

Dr. Ghosh, as the medical director of Stateville, mostly monitored and approved of Norwood's medical treatment from afar, but he began to personally treat Norwood on July 16, 2009. After that visit, Dr. Ghosh immediately ordered a MRI for Norwood's right knee, and upon review, diagnosed Norwood with a lateral meniscal tear, a cartilage defect, and a Baker's cyst. He then sent Norwood for consultation with an orthopedic specialist who recommended an arthroscopy and chondroplasty surgery, which Norwood ultimately underwent. There were some delays from the time that Dr. Ghosh first saw Norwood until his surgery, but there is no evidence that Dr. Ghosh caused those delays. Dr. Ghosh did not "know of and disregard an excessive risk to [Norwood's] health." Greeno, 414 F.3d at 653. Dr. Ghosh was not deliberately indifferent by not ordering an MRI sooner. Furthermore, the treatment Dr. Ghosh did provide was not "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate [Norwood's] condition.'" Arnett, 658 F.3d at 751 (quoting Greeno, 414 F.3d at 653).

Dr. Ghosh could face liability if he did not provide pain medication after Norwood's surgery and "unnecessarily prolonged [his] pain." Arnett, 658 F.3d at 753. However, the medical records show that Dr. Ghosh prescribed Tylenol 3 immediately upon Norwood's return to Stateville. Dr. Ghosh did prescribe a pain medication different from the Vicodin prescribed by Dr. Chmell, however, "[m]ere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to show deliberate indifference. Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006). It also appears that Dr. Ghosh considered several drug alternatives and used professional judgment in managing Norwood's post-surgery pain medication. Dr. Ghosh's treatment decision did not substantially depart from accepted professional judgment necessary to demonstrate deliberate indifference. Accordingly, summary judgment is granted in favor of Dr. Ghosh.

### 3. Drs. Tilden and Zhang

In his motion, Norwood does not oppose summary judgment with respect to Dr. Tilden and Dr. Zhang. Norwood only visited Dr. Tilden twice – soon after his May 2006 injury and during a follow-up visit a couple weeks later. During the first visit, Dr. Tilden assessed Norwood's left knee strain and prescribed, among other things, pain relieving medication and a knee wrap for support. On the second visit, Dr. Tilden noted that the swelling in Norwood's knee subsided and full range of motion returned in Norwood's knee. Dr. Tildan was not aware of any serious risk to Norwood's health and pursued a reasonable course of treatment. Likewise, Dr. Zhang met with Norwood two times. Only one visit concerned Norwood's knee problems, and on that visit, Dr. Zhang changed Norwood's pain medication from Tramadol, a more potent but short-term pain medication, to Motrin, a less potent drug with fewer side-effects. Neither Dr.

Tilden nor Dr. Zhang treated Norwood with deliberate indifference. Therefore, Drs. Tilden and Zhang's motions for summary judgment are granted.

**C. Dr. Saleh Obaisi and Warden Tarry Williams' Motion for Summary Judgment**

Norwood also seeks prospective injunctive relief from Dr. Obaisi, the current medical director of Stateville, and Terry Williams, the current warden of Stateville. To succeed on a claim for injunctive relief, a plaintiff must show: "1) it has a reasonable likelihood of success on the merits of the underlying claim; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if the preliminary injunction is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest." Kiel v. City of Kenosha, 236 F.3d 814, 815-16 (7th Cir. 2000).

Here, one of the irreparable harms that Norwood claims that he continues to suffer from is that "[t]he exercise bike that [he] uses for physical therapy is in need of repair." Pl.'s Statement of Additional Facts ¶ 83. As discussed above, Norwood has not shown that he has been denied adequate medical care by the Medical Provider Defendants. Additionally, after Norwood filed his complaint, he has received medical treatment for his knee problems while incarcerated at Stateville, including a full knee replacement of his right knee. Therefore, Norwood does not show a likelihood of success on the merits of his claim for injunctive relief against the current warden and medical director and summary judgment is granted in their favor.

**D. Norwood's State-Law Intentional Infliction of Emotional Distress Claim**

"As a general matter, when all federal claims have been dismissed prior to trial, the federal court should relinquish jurisdiction over the remaining pendant state claims." Williams v. Rodriguez, 509 F.3d 392, 404 (7th Cir. 2007). Having entered judgment in favor of Defendants

on all of Norwood's federal claims without reaching the merits of Norwood's state claim, the Court relinquishes jurisdiction to the state court. Accordingly, Norwood's intentional infliction of emotional distress claim is dismissed.

### III. CONCLUSION

For the foregoing reasons, summary judgment on Norwood's deliberate indifference claim is granted in favor of Defendants. Summary judgment is granted in favor of Defendants on Norwood's injunctive relief request. Norwood's intentional infliction of emotional distress claim is dismissed.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: April 15, 2015